IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| JWA Co., Ltd. | |
| *Plaintiff*, | |
| v. | Civil Action File No.: _____ |
| Enchem America, Inc.; Enchem Co., Ltd. | |
| *Defendants*. | |

## COMPLAINT FOR DAMAGES AND PETITION FOR PERMANENT INJUNCTION

COMES NOW Plaintiff JWA Co., Ltd. ("JWA"), by and through counsel, and files its Complaint against Defendants Enchem America, Inc. ("Enchem America") and Enchem Co., Ltd. ("Enchem Korea" and collectively, "Defendants" or "Enchem") and shows this Court as follows:

## NATURE OF THE ACTION

1.     JWA is a wholly owned subsidiary of Jaewon Industrial Co., Ltd., a South Korean corporation. JWA has been granted an exclusive license to both the tangible and valuable intangible intellectual property of Jaewon Industrial Co., Ltd.

2.     Jaewon Industrial Co., Ltd. and JWA Co., Ltd. (collectively, "Jaewon") are the global leaders in obtaining waste N-methyl-2-pyrrolidone ("NMP") solvent

1

used in manufacturing secondary batteries (particularly for EVs) and purifying it into secondary battery-grade NMP solvent ("R-NMP" or "recovered NMP"). Jaewon has invested hundreds of millions of dollars and decades of R&D efforts to develop its proprietary technology for recovering, processing, and handling of NMP.

3.     A "yield" refers to the ratio of the quantity of R-NMP obtained after successful purification methods relative to the initial quantity of waste NMP inputs. It is the key criterion for measuring a company's technological capability and business value in connection with achieving commercial mass production of R-NMP.

4.     A successful NMP recovery business requires achieving both high yield and purity levels in R-NMP to be cost competitive relative to new NMP. Generally, an NMP recycling and purification business for EV secondary batteries cannot attain commercially viable profitability unless it can achieve minimum yield and purity levels in excess of 90% and 99%, respectively. Jaewon's recovered NMP today boasts over 99.9% purity and 99% yield levels, while the highest average figures for other competitors have failed to exceed 99.8% in purity and 90% in yield, making Jaewon the undisputed leader in both metrics.

5.     Through years of research and development and mass production experience, Jaewon has perfected its proprietary NMP recovery facilities, equipment specifications, materials, NMP recovery techniques, processes and procedures (collectively, the "JWA NMP Trade Secrets").

6.     The JWA NMP Trade Secrets have independent economic value and provide JWA with a competitive advantage because they are not generally known.

7.     Specifically, Jaewon achieved consolidated gross revenues of 172.2 billion KRW (approximately $132 million) in 2023 from its NMP recycling business alone, and its R-NMP business revenues are expected to grow at double-digit rates as the EV industry grows.

8.     It is impossible for other companies without the original technology to independently achieve the technical level required to mass-produce recovered NMP with similar purity and yield levels as Jaewon, without access to Jaewon's proprietary technology and the JWA NMP Trade Secrets. Even if it were possible, it would take a competitor a considerable amount of time, effort, expense, and expertise to replicate the JWA NMP Trade Secrets.

9.     Since Defendants first entered into the NMP recovery business in or about 2019, Defendants have consistently and aggressively attempted to obtain and use the JWA NMP Trade Secrets, primarily by (1) raiding Jaewon's employees and encouraging and improperly obtaining the JWA NMP Trade Secrets from those former employees, (2) eliciting Jaewon's third-party engineering business partners to share the JWA NMP Trade Secrets with Defendants, and/or (3) obtaining the JWA NMP Trade Secrets directly from Jaewon's customers.

10.     On information and belief, Defendants were initially unable to mass-produce recovered NMP with required yield and purity levels in sufficient quantities to meet the demands of their only major customer, SK Battery America, Inc. (located in Commerce, Georgia). Defendants were under enormous pressure to perfect their mass-production of NMP recycling methods to keep their customer, and therefore were aggressively trying to obtain the JWA NMP Trade Secrets.

11.     On information and belief, Enchem Korea has directed the hiring of at least six (6) Jaewon employees who had access to and intimate knowledge of the JWA NMP Trade Secrets, including but not limited to the type and methodology of impurities to be distilled and the operational procedures of the distillation facility, the material suppliers and equipment for mass production of recovered NMP.

12.     The records of Defendants' engagement and communications with Jaewon employees and vendors clearly demonstrate Defendants' deliberate intent to obtain the JWA NMP Trade Secrets. In and around 2022, when Enchem America's NMP plant was constructed, Enchem Korea first hired Jaewon's former R&D researcher who had knowledge of Jaewon's proprietary technology and methodology for identifying and removing specific impurities from waste NMP. Next, Enchem Korea hired another Jaewon employee who had experience in designing and improving Jaewon's distillation facilities. In addition, Enchem Korea aggressively reached out to Jaewon's EPC vendors for Jaewon's equipment and

design specifications for its distillation towers. Finally, Enchem Korea hired Jaewon's technical expert who had over two decades of hands-on experience in actual NMP distillation tower management and detailed operation procedures for mass-production of recovered NMP.

13. According to a confidential informant, the former technical expert from Jaewon subsequently admitted in or about December 2023 that he had spent extended time at Enchem America's NMP distillation plant in Commerce, Georgia during 2023, where he tried to improve the purity and yield levels of recovered NMP at Enchem America. He also stated to this confidential informant that his efforts at Enchem directly resulted in "significant improvements" in purity and yield levels at Enchem America.

14. Based on multiple industry sources — including JWA's key customers — Enchem America has made dramatic improvements in its recovered NMP purity and yield levels in just a few years since 2022. Industry experts all agree that it is rare to see a new entrant like Defendants improve their product quality in just a few years without benefiting from proven existing technologies.

15. On information and belief, without having misappropriated trade secrets and other confidential business information through unlawful poaching and solicitation of Jaewon's employees and engineering vendors, Defendants would not

have been able to progress so rapidly in their development of NMP recycling technology.

## PARTIES

16.     Plaintiff JWA is a wholly owned subsidiary of Jaewon Industrial Co., Ltd., a South Korean company. JWA is the exclusive U.S. licensee of Jaewon Industrial Co., Ltd.'s intellectual property rights, including its NMP recovery technology. JWA is incorporated in the State of Indiana with its principal place of business at 1679 S Sparks Rd. Kokomo, IN, 46901.

17.     Plaintiff JWA, as Licensee, has been authorized to proceed with this action by Licensor, Jaewon Industrial Co., Ltd., pursuant to Article 3 (Enforcement) of the Technology License and Assistance Agreement (Jaewon – JWA) signed by the two parties on October 1, 2023.

18.     Defendant Enchem America is a subsidiary of Enchem Korea, a South Korean company, and is incorporated in the State of Georgia, with its principal place of business at 648 Highway 334, Commerce, GA 30530. Enchem America can be served with process through its registered agent, Barun Accounting LLC, at 1110 Satellite Blvd NW, Ste 303, Suwanee, GA 30024.

19.     Defendant Enchem Korea is a parent company of Enchem America and is incorporated in South Korea, with its principal place of business at 107 Biovalley-ro, Jecheon-si, Chungcheongbuk-do, South Korea. Enchem Korea can be served

with process through its subsidiary, Enchem America, as Enchem America is in direct control of Enchem Korea. Alternatively, Enchem Korea can be served with process pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

## JURISDICTION AND VENUE

20.     This action arises under the federal and state laws of the federal Defend Trade Secrets Act and the Georgia Trade Secrets Act.

21.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises out of the violation of a federal law, the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* Defendants are engaged in the NMP recovery business of purifying waste NMP supplied by secondary battery manufacturers both in and outside of the United States and supplying purified NMP back to secondary battery manufacturers both in and outside of the United States, thereby satisfying 18 U.S.C. § 1836(b)(1). As further detailed in this Complaint, Defendant Enchem Korea directed the hiring of former employees at Plaintiff's parent company and Licensor, Jaewon Industrial Co., Ltd., in South Korea specifically to dispatch them to work at Enchem America. Enchem Korea also solicited several third-party engineering firms working for Jaewon Industrial Co., Ltd. to share the JWA NMP Trade Secrets with Enchem America ― for the specific purpose of deploying such technologies at Enchem America's R-NMP plant located in Commerce, Georgia. In turn, Enchem

7

America has directly benefited in the United States from utilizing the personnel and technology resources provided by Enchem Korea. Therefore, this Court has subject matter jurisdiction under 18 U.S.C. § 1837.

22.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between a citizen of this State and a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23.     This Court also has supplemental jurisdiction over the asserted state law claims under 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

24.     This Court has personal jurisdiction over Enchem America in this action because certain of the acts complained of herein occurred in Georgia, including knowingly engaging in one or more acts in furtherance of the trade secret misappropriation alleged herein being directed to and occurring in Georgia. In addition, Defendant Enchem America has a regular and established place of business in this District and has established minimum contacts with this forum such that the exercise of jurisdiction over Enchem America would not offend traditional notions of fair play and substantial justice.

25.     This Court has personal jurisdiction over Enchem Korea in this action because all of Plaintiff's former employees were solicited and employed by Enchem

Korea and all of Plaintiff's engineering vendors were contacted and requested by Enchem Korea to provide the JWA NMP Trade Secrets for the specific purpose of deploying them in Commerce, Georgia. Given that Enchem Korea has never been engaged in the NMP recovery business in Korea, all of the acts were done with the sole purpose of using the JWA NMP Trade Secrets at Enchem America's Georgia plant. Therefore, the exercise of personal jurisdiction by this Court is proper as Enchem Korea acted in furtherance of misappropriation in Georgia, establishing purposeful availment for jurisdiction.

26.     Venue as to Enchem America is also proper in this District under 28 U.S.C. §§ 1391 and 1400(b). Enchem America resides in this District and/or has committed acts of trade secret misappropriation and has a regular and established place of business in this District.

## BACKGROUND

### A. Jaewon's Trade Secrets Are Critical to its NMP Business Success.

27.     Since as early as 2004, Jaewon has invested hundreds of millions of dollars and decades of effort in developing its proprietary technology of recovering waste NMP solvent used in manufacturing secondary batteries and purifying it into secondary battery-grade NMP solvent.

28.     NMP is a low-viscosity, colorless, non-toxic organic solvent with excellent heat resistance. Because NMP is a chemically stable and highly polar solvent, it is very useful for various chemical reactions that require an inert medium.

29.     NMP is widely used as a solvent for polymer polymerization and processing, a solvent for paint manufacturing, a metal surface cleaner, a solvent for synthesis and purification of pharmaceuticals, a processing solvent for semiconductors and electronic materials, and a solvent for lithium battery manufacturing. The impurities contained in waste NMP vary widely depending on its previous use, and the methods for removing and purifying these impurities also differ. Specifically, NMP used for semiconductors/electronic materials and NMP used for secondary EV batteries differ in the types and amounts of impurities, which results in differences in their purification processes.

30.     In addition, due to specific chemical purity level and composition requirements for solvents in the manufacturing of secondary batteries, the recovery and purification process of NMP for secondary batteries used by EV battery manufacturing customers requires far more sophisticated technologies and methods than NMP for semiconductors/electronic materials. It is generally accepted that the purification process for recovering secondary battery-grade NMP requires multi-stage, fractional distillation techniques that are at a minimum 10 times more precise

and sensitive than similar techniques used in the purification process for other industrial-purpose NMP (i.e., pharmaceutical industry).



**(Estimated) NMP Market Analysis**

| | | | | Y2024 | Y2025 | Y2026 | Y2027 | Y2028 | Y2029 | Y2030 |
|---|---|---|---|---|---|---|---|---|---|---|
| Global Demand | **Battery(Gwh)** | | | **1,462** | **1,819** | **2,224** | **2,658** | **2,928** | **3,432** | **3,974** |
| | **NMP(MT)** | | | **1,343,578** | **1,697,855** | **2,075,882** | **2,480,977** | **2,732,995** | **3,203,429** | **3,709,332** |
| | | **S-NMP** | | **268,716** | **339,571** | **415,176** | **496,195** | **546,599** | **640,686** | **741,866** |
| | | **R-NMP** | | **1,074,862** | **1,358,284** | **1,660,705** | **1,984,782** | **2,186,396** | **2,562,743** | **2,967,465** |
| | China | Market Share | | 73.0% | 77.8% | 77.8% | 77.8% | 77.8% | 77.8% | 77.8% |
| | | Battery(Gwh) | | 1,067 | 1,415 | 1,730 | 2,068 | 2,278 | 2,670 | 3,092 |
| | | NMP(MT) | | 1,067,260 | 1,415,182 | 1,730,272 | 2,067,924 | 2,277,984 | 2,670,096 | 3,091,772 |
| | | | S-NMP | 213,452 | 283,036 | 346,054 | 413,585 | 455,597 | 534,019 | 618,354 |
| | | | R-NMP | 853,808 | 1,132,146 | 1,384,218 | 1,654,339 | 1,822,387 | 2,136,077 | 2,473,418 |
| | Others | **Market Share** | | **27.0%** | **22.2%** | **22.2%** | **22.2%** | **22.2%** | **22.2%** | **22.2%** |
| | | **Battery(Gwh)** | | **394.74** | **403.82** | **493.73** | **590.08** | **650.02** | **761.90** | **882.23** |
| | | **NMP(MT)** | | **276,318** | **282,673** | **345,610** | **413,053** | **455,011** | **533,333** | **617,560** |
| | | | **S-NMP** | **55,264** | **56,535** | **69,122** | **82,611** | **91,002** | **106,667** | **123,512** |
| | | | **R-NMP** | **221,054** | **226,138** | **276,488** | **330,443** | **364,009** | **426,666** | **494,048** |

31.     NMP is an expensive substance, and its supply has been largely monopolized by two major multinational corporations (i.e., BASF SE and Ashland Inc.), making it a very difficult raw material to procure. In general, 1,000 tons of NMP are required to manufacture 1GWh of battery capacity. With the rapid expansion of the secondary battery market for EVs, the supply of new NMP is expected to become even more scarce. Therefore, NMP recycling and purification has become an essential technology in the manufacture of secondary batteries for EVs in the United States.

32.     Jaewon is essentially the only company in the world that has perfected the "mass NMP recovery technology" to satisfy the most rigorous yield and purification specification requirements for NMP that are demanded by leading global EV battery manufacturers. More specifically, many leading secondary battery manufacturers require the removal of a handful of specific but highly challenging compounds and metal impurities from recycled NMP, while limiting its moisture level to the minimum to maximize both safety and performance standards. The removal of some of these compounds and limiting the moisture range to at least a third of the allowable moisture range for industrial use are also absolutely essential, because their residual presence in NMP can destabilize electrode surfaces and increase surface reactions at the so-called solid-electrolyte interface ("SEI"). These conditions are known to increase "lithium plating" in secondary batteries — the chief

known cause for "thermal runaways" (i.e., heat combustion) inside secondary batteries.

33.     Creating a large throughput manufacturing facility that achieves a high consistency of purity and yield from large quantities of waste NMP containing various impurities requires starkly more advanced technologies and operational know-how than creating a small batch of recycled prototype NMP in a controlled laboratory setting. Significant investment, technological development efforts, and repeated trials and errors, including designing processes and material facilities, are required to perfect the mass production technology. The JWA NMP Trade Secrets pertain specifically to this mass production technology, which Jaewon has developed and gradually perfected for over 20 years, incorporating its proprietary technologies, processes, and know-how.

34.     Even if similar equipment (i.e., distillation tower) is used, the specific equipment designs and the specific manner in which the operating conditions (i.e., flow rate, temperature, pressure, humidity, etc.) are adjusted for each purification process have a decisive impact on the purity and yield of the NMP purification process. Through continuous investment and repeated research and development, Jaewon has achieved the yield level exceeding 99.0% and the purity level exceeding 99.9% for its R-NMP. In short, Jaewon's recycled and purified NMP has attained

purity and yield levels that are unmatched globally, and its purity level is at times even *higher* than what is observed in *new* NMP.

35. This was only possible when the optimized purification process sequence and methods, operating conditions for each process, detailed operating methods, and various quality control measures, accumulated through long-term research and practical experience, were comprehensively in place. Therefore, Jaewon has served as the near exclusive or leading supplier of recovered NMP solvents to the leading global EV secondary battery manufacturers, including Samsung SDI Co., Ltd. SK On Company, and LG Energy Solution, Ltd. and their respective U.S. operating subsidiaries.

36. Jaewon's proprietary NMP refining technology and mass production techniques have independent economic value and provide Jaewon with a competitive advantage not only because they are not generally known to others but also because, at present, only Jaewon has achieved a commercially viable level of purity and yield by a convincing margin relative to its competitors.

37. Specifically, Jaewon achieved gross revenues of 172.2 billion KRW (approximately $132 million) in 2023, 130.3 billion KRW (approximately $100 million) in 2024 and 92.8 billion KRW (approximately $71 million) in 2025 from its

NMP recycling business alone.[1]

38. Through years of research and development and mass production experience, Jaewon has developed proprietary NMP recovery facilities and equipment specifications and NMP recovery techniques, processes and procedures (collectively, the "JWA NMP Trade Secrets"), including but not limited to:

1) **Technologies for purifying waste NMP** by identifying and removing specific impurities through a specialized distillation process: Jaewon has proprietary techniques, processes and procedures to recover high purity NMP at high yield through multi-layered sophisticated processes including adding specific alkaline additives in the pre-treatment process and using ion-exchange resin columns in the post-treatment process to enhance the yield and purity of refined NMP. Jaewon's proprietary techniques have achieved a yield of over 99% and a purity level of over 99.9% of recovered NMP, while its competitors' yield remains around 90%. Jaewon's NMP purification techniques include the following:

   a) Identification of components of waste NMP and purified NMP: Jaewon has invested years of effort in identifying ingredients and components of waste NMP because purification of such impurities

---

[1] The decrease in Jaewon's gross revenues since 2023 is mainly due to a decrease in the price of new NMP and a slump in the secondary battery market.

through distillation, absorption, or chemical processing is possible only after identifying the nature of the impurities contained in waste NMP such as boiling points. In the process, Jaewon has successfully identified and code-named a basket of specific and highly challenging impurities to be removed.[2]

b) Method to increase the purity and yield level of recovered NMP: Jaewon has developed sophisticated methods to remove those identified impurities tailored to specific nature and characteristics of the impurities. Jaewon's techniques of identifying and removing these specific impurities by adding specific alkaline additives in the pre-treatment process and using ion-exchange resin columns in the post-treatment process are generally patented in the U.S., Canada, China, EU and South Korea.

2) **Operational procedures for mass-producing recovered NMP**: Once Jaewon's R&D team identifies specific impurities contained in waste NMP and develops methods to remove them, Jaewon runs the distillation process at its mass-production tower facilities. This process requires sophisticated

---

[2] The code names for these specific impurities are created by Jaewon. Therefore, if Defendants or another company use the same names for the same impurities, it could be interpreted as the company having directly misappropriated Jaewon's methodology. For the purpose of this Complaint, the seven impurities will be referred to as Impurity 1 through Impurity 7.

management and modifications of distillation environments to respond to numerous variances in the distillation columns and fields. Jaewon's tower operators and technicians have been trained to translate laboratory-developed technologies into mass-production operational procedures by adding heat, releasing heat, and repeating reflux steps to obtain the required purity and yield levels of recovered NMP. Jaewon has developed, maintained, and improved detailed Standard Operating Procedures ("SOPs") for its waste NMP distillation facilities and equipment. Since 2005, Jaewon has established process quality control checkpoints, analyzed causes of problems, and developed solutions through numerous trials and errors in NMP production. While each distinct step or facet of SOPs may not be proprietary in nature, the specific method in which Jaewon has uniquely combined, ordered, or timed such operational procedures should be recognized as a trade secret. If a competitor without experience in operating the NMP purification process acquires this information, they can quickly optimize process conditions by confirming the quality trends and changes in products due to changes in operating conditions. This will allow them to mass-produce high-purity NMP at a yield level similar to Jaewon's without significant efforts. Jaewon's recovered NMP mass production techniques include the following:

a) Refined NMP quality control: Responding to quality changes in waste NMP during the purification process is crucial for high-purity NMP recovery. Competitors cannot respond to quality changes in waste NMP, leading to its disposal and achieving only less than 90% yield. However, Jaewon has the capability to respond to quality changes in waste NMP, achieving a yield of over 99%. Jaewon's proprietary quality control techniques include the following:

- Information related to process conditions such as process temperature and pressure for each facility, product specifications, and the flow rate of incoming raw materials;

- Management standards for each operating condition (upper and lower limits) to meet quality control standards for each process during actual NMP purification to ensure the required quality control;

- Test conditions and methods for analyzing organic and inorganic (ion) contents in NMP with analytical equipment capable of quantitative and qualitative analysis;

- Methods for sampling test specimens, replacing filters, and inputting raw materials to check quality during the process;

- Management standards for quality status (specifications, average, upper, lower limits, etc.) of raw materials and finished products;

- Methods for quality assurance including major criteria, management methods, and measures to be taken in case of abnormalities for each process to ensure quality assurance for each NMP purification process; and

- Post-quality inspection management.

b) Standard Operating Procedures for mass production of recovered NMP: In order to continuously produce commercial products by inputting large quantities of raw materials through large-scale facilities, the entire and each process condition should be fully optimized. Jaewon has developed and maintained standard operating procedures to optimize mass production process through numerous trials and errors. This includes detailed process diagrams, specific process conditions and management standards for each process for optimization of process conditions;

- Process operation know-how: This covers conditions related to flow rate, temperature, pressure, and level. Specifically, it includes methods for inspecting equipment before operation,

starting and maintaining equipment operation, emergency operation methods, and procedures for sampling NMP from equipment. It also comprehensively covers all operational procedures and detailed process conditions and management standards for all NMP purification processes, including distillation, pre-treatment, and post-treatment processes.

3) **Confidential business information**: This includes data on Jaewon's manufacturing costs (labor costs, material costs, facility costs, etc.) and its customers, including contract terms and specifications of the products supplied by Jaewon. If competitors use this data, they will gain an unfair advantage in attracting customers, placing them in a more favorable position than Jaewon.

39.     Jaewon independently established this technical expertise. Jaewon has accumulated know-how in the purification business for nearly 20 years and began developing its NMP purification process from about 2004, taking three full years to mass-produce its first R-NMP. It has taken more than 18 years to continuously improve its process technology from the initial mass production to the present.

40.     In doing so, Jaewon has conducted more than 200 research projects related to the mass production of recovered NMP. In addition, the cost of purchasing essential research equipment and the labor costs of the personnel involved in

researching the NMP purification process alone amount to hundreds of millions of dollars. Considering these multi-decade R&D efforts alone, the costs incurred by Jaewon in establishing its leading technical expertise is of an enormous scale and value that cannot be simply calculated.

41.     Jaewon is also the global leader in issuing cutting-edge patents relating to R-NMP purification techniques. For example, it has published multiple patents for its waste NMP purification methods in the United States, Canada, China, EU, and Korea — specifically relating to identifying and removing several key impurities that are commonly found in secondary batteries used for EVs.[3]



**Abstract**

**[EN]** The present invention relates to a method for purifying a waste N-methyl-2-pyrrolidone (hereinafter referred to as NMP) mixture solution and, more specifically, to a method for purifying a waster NMP mixture solution by using a base. According to the present invention, by applying the base to the waste NMP mixture solution, NMS and GBL can be simultaneously removed to collect high-purity NMP.

**[FR]** La présente invention concerne un procédé de purification d'une solution mixte de N-méthyl-2-pyrrolidone résiduaire (désigné ci-après par NMP) et, plus particulièrement, un procédé de purification d'une solution mixte de NMP résiduaire à l'aide d'une base. Selon la présente invention, du NMS et du GBL peuvent être simultanément retirés pour collecter du NMP de grande pureté par application d'une base à la solution mixte de NMP résiduaire.

**[KO]** 본 발명은 폐 N-메틸-2-피롤리돈(이하, NMP라 함) 혼합액의 정제방법에 관한 것으로, 더욱 상세하게는 염기를 이용하여 폐 NMP 혼합액을 정제하는 방법에 관한 것이다. 본 발명에 따르면, 폐 NMP 혼합액에 염기를 적용함으로써 NMS 및 GBL을 동시에 제거하여 고순도의 NMP를 회수할 수 있다.

**Publication Number**
WO/2021/006598

**Publication Date**
14.01.2021

**International Application No.**
PCT/KR2020/008854

**International Filing Date**
07.07.2020

**IPC**
C07D 207/267 2006.1

**CPC**
C07D 207/26   C07D 207/267   Y02E 60/10

**Applicants**
재원산업 주식회사 JAEWON INDUSTRIAL CO., LTD
[KR]/[KR]
전라남도
여수시
낙포단지길 79 (낙포동)
(Nakpo-dong) 79, Nakpodanji-gil,
Yeosu-si,
Jeollanam-do 59618
Republic of Korea
[주]이엠테크 EM TECH. CO.,LTD [KR]/[KR]
충청남도
서산시
대산읍 독곶1로 36-21
36-21, Dokgot 1-ro, Daesan-eup,
Seosan-si,
Chungcheongnam-do 31901

**Title**
**[EN]** METHOD FOR PURIFYING WASTE N-METHYL-2-PYRROLIDONE MIXTURE SOLUTION
**[FR]** PROCÉDÉ DE PURIFICATION D'UNE SOLUTION MIXTE DE N-MÉTHYL-2-PYRROLIDONE RÉSIDUAIRE
**[KO]** 폐 N-메틸-2-피롤리돈 혼합액의 정제방법

**Related patent documents**
KR102109401   CA3137186   CN113727969   EP3932905   US20220144772   PL3932905   ES2969487   HUE065236

---

[3] https://patentscope.wipo.int/search/en/detail.jsf?docId=WO2021006598&_cid=P2
1-MGZSQ1-75596-1.

42.    Jaewon's proprietary technologies ("Method for purifying waste NMP mixture solution to secondary battery grade NMP") have also been registered as National Advanced Technologies ("NAT") in Korea under Article 2 of the Industrial Technology Protection Act and Article 5 of the Industrial Development Act in the following three sectors. The patents and the classification as NAT of Jaewon's NMP Trade Secrets confirm that Jaewon's NMP technologies confer significant competitive advantages to Jaewon.

| Sector No: 11. Ceramics | | | | | |
|---|---|---|---|---|---|
| Classification | Mid-classification | Sub-classification | Advanced technology and product | Registered year | No. |
| Energy / Environment-friendly materials | Recyclable materials | Industrial residue-upcycle | Secondary battery industrial residue utilizing technology | 2019 | 26 |
| Sector No: 14. Vehicles | | | | | |
| Electronic vehicles | Electronic vehicles | xEV energy storage system | Lithium battery materials technology | 2015 | 2 |
| Sector No: 10. Clean Technology | | | | | |
| Clean process | Efficient resource process | Recycling technology | Process residue recycling technology | 2010 | 14 |

43.    To reach the purity level of over 99.9% in recovered NMP, the four key impurities (Impurity 1, Impurity 2, Impurity 3, and Impurity 4) that are inherent by-products of NMP manufacturing must be removed from waste NMP. For instance, Impurity 1 is one of the main ingredients used to synthesize NMP; therefore, it is inevitable that an NMP solvent contains a certain level of Impurity 1. Synthesizing

NMP also creates Impurity 2, while Impurity 3 and Impurity 4 are generated in the distillation process, as Impurity 2, Impurity 3, and Impurity 4 are naturally formed through oxidation whenever NMP is exposed to oxygen.

44. As a result, a purity level of over 99.9% cannot be achieved unless the combined amounts of Impurity 1, Impurity 2, Impurity 3, and Impurity 4 are controlled to be under 0.1%. However, the four impurities cannot be removed through simple distillation.

45. For example, Impurity 2 has a boiling point of only 2°C different from NMP, making it extremely challenging to separate and remove it through traditional distillation techniques alone. Jaewon possesses proprietary technology and know-how for adding specific oxidizing and reducing agents while calibrating specific purification environments in its distillation towers to successfully remove it.

46. Through years of mass production experience, Jaewon obtained empirical understanding of the trends in the effects of temperature/pressure/input volume on NMP refinement and impurity removal. The optimal process operating conditions such as how temperature/pressure/input volume are adjusted and the resulting effects on the refined product and impurity removal can only be identified during the actual process operation stage.

47.     This information has been continuously updated by Jaewon, reflecting the results obtained through repeated experiments over a long period and the results of trial and error that occurred during the process.

48.     Therefore, it is impossible for other companies without original knowledge or experience in NMP purification to independently develop and achieve a commercially viable level of mass production of recovered NMP, without transferring the technology from the technology holder. Even if it is possible, it requires an unpredictable amount of time and effort. However, if Jaewon's technologies and know-hows are acquired by another person or entity, it is possible for them to understand the core processes of Jaewon's technology, which generates annual sales of more than 100 million dollars, without incurring the time and effort spent by Jaewon.

## B. Jaewon Has Diligently Protected Its Trade Secret Information

49.     At all relevant times, Jaewon has taken reasonable measures to maintain the secrecy of its NMP Trade Secrets and other confidential business information, and has not granted permission to reproduce, use, or disclose, in whole or in part, such trade secret and other confidential business information.

50.     Jaewon has employed industry-standard security practices through its promulgation and enforcement of internal security policies that explicitly prohibited disclosure of and restricted access to Jaewon's confidential information, including

the JWA NMP Trade Secrets. Jaewon made considerable additional efforts to maintain the secrecy of the JWA NMP Trade Secrets, including but not limited to:

1) All Jaewon personnel with access to documentation and/or use of the JWA NMP Trade Secrets have been and are subject to contractual obligations of confidentiality, including by signing confidentiality agreement and/or non-compete agreement.

   a) Specifically, each employee is required to sign a Non-disclosure Agreement which includes the following commitments when he or she joins and/or leaves Jaewon:

   > *I will strictly adhere to all company regulations related to the protection of trade secrets, which are not publicly known and have independent economic value, and I will take responsibility for them. [···] I will not use the company's trade secrets for personal purposes or disclose them to third parties inside or outside the company, except for designated work purposes. [···]* ***Upon resignation, I will not disclose or engage in the same or similar industry for at least two years without the company's consent. I will not disclose or reveal the company's trade secrets obtained during my employment to third parties in any way without the company's prior consent, even after resignation.***

   b) The resignation letter also contained similar language:

   > *I will not disclose any confidential information of the company that I have learned during my employment to any third party (see attached pledge). I will not copy or photograph any computer files or materials stored during my employment and will not leak them.*

2) Jaewon has also expressly required its suppliers or vendors to abide by Jaewon's security policy and not to disclose any information they obtained in working with Jaewon to a third party:

a) All suppliers or vendors that may have access to Jaewon's confidential information are required to sign a contract that contains a Confidentiality clause:

> *Article 25 (Confidentiality)*
> *1. The vendor is responsible for verifying the identity of every individual involved in the project.*
> *2. The vendor shall not disclose any work-related confidential information or personal information of Jaewon's equipment, personnel, or business obtained while working on the project.*
> *3. The vendor and Jaewon shall comply with the above requirements not only during the contract period but also after the completion or termination of the contract. The vendor shall indemnify and hold harmless Jaewon for any damage resulting from the breach of the above requirements.*

b) A Non-Disclosure Agreement ("NDA") is additionally required for major projects. The NDA defines confidential information as all technical data and other business-related information provided in connection with the project, as well as ideas and know-how of either party that are designated as confidential information. Article 4 (Obligation to Maintain Confidentiality and Handling of Confidential Information) provides:

*(1) The recipient of the information shall not use the confidential information for any purpose other than those related to the project.*

*(2) The recipient of the information shall prevent the leakage or unauthorized disclosure of the confidential information provided by the provider. To this end, the recipient of the information shall establish and implement sufficient internal security procedures to prevent leakage or unauthorized disclosure of the confidential information.*

*…*

*(4) All confidential information provided by the information provider to the information recipient is owned by the information provider, and all rights related to it belong to the information provider. Under no circumstances shall this agreement be interpreted as granting any rights or licenses to the information recipient regarding confidential information.*

   c)  Pursuant to Article 6 of the NDA, the recipient of the information "must fulfill all obligations and responsibilities to comply with the provisions of this agreement, and shall compensate the information provider for any damages incurred due to the improper disclosure or leakage of confidential information caused by the fault of the information recipient or its employees."

   d) Even miscellaneous contracts, such as simple procurement of materials, contain a provision that requires the other party not to disclose Jaewon's trade secrets.

3) Jaewon has kept the most sensitive technology information in a separate data storage system to which only authorized persons can have access. Jaewon has developed its own centralized Data Management System

("DMS"), "Cloud Doc," that organizes folders and controls access to each folder in a tree structure. Access to confidential information can be granted to a team or an individual only upon pre-authorization. Folders are structured by department, position, and specific task. Each team and/or department has a designated person who manages access control to the team folder. For example, authority to access Jaewon's NMP Trade Secrets documents is strictly limited to R&D Department and Production Management Team. The DMS can be accessed only through pre-authorized IP addresses in Korea. Any access from foreign IP addresses is completely blocked.

4) External storage devices or access to cloud-based storage services are blocked with DLP system and USBs can be used only upon pre-authorization.

5) All email communications through Jaewon's groupware system are archived in a separate backup server along with log-in records.

6) In addition, Jaewon evaluates the level of importance of information based on the three indices of confidentiality, integrity, and availability, and designates the majority of its NMP recovery-related information as "Confidential" and controls access to this confidential information. Examples of documents marked "Confidential" include:

*All internal documents about product development and mass production transition processes; All internal guidelines, including product development guidelines and mass production guidelines; SOPs, including secondary battery-grade NMP manufacturing procedural standards; Test standards; Equipment operating standards, including gas chromatography equipment operating standards; Laboratory experiment and research reports, including NMP research reports; Business plans, KPIs, new product and new technology meeting minutes, internal OJT documents; Internal policies, guidelines, and manuals.*

7) Finally, Jaewon has consistently and repeatedly warned its competitors, including Enchem Korea, and contractors of the serious consequences for any trade secret misappropriation.

51. In addition to Jaewon's general policies, JWA has specifically developed and employed a very thorough and comprehensive "Internal Network/Data Security Plan" as follows:

1) JWA's Network/Data Security Policies include the use of NTFS File System BITs encrypted with manager keys, confidentiality labels, and monitoring systems like Windows Defender and PurView DLP to protect confidential files. External sharing attempts are immediately notified to managers, and only top-level pre-authorized management can share protected files externally. Non-authorized devices are restricted from accessing JWA's file system, and access must be made through JWA Domain Joined Devices.

2) Management devices must install a Management Certificate and use Wi-Fi secured with an SSL Certificate to access the network. Authorized devices must be added to ACLs in advance, and the network firewall is configured with zero-trust policies. Unused network switch ports are turned off to prevent unauthorized access.

3) Data access is monitored in real-time by Defender/PurView DLP and Domain File Access Auditing. Daily File Access Reports are generated and inspected weekly by the IT Team. Attempts to send company data outside the organization are logged, and copying data to external storage devices is prohibited by network security policies and employee agreements.

4) Access to company data is controlled, restricting unauthorized users. Access is granted based on individual users or security groups, ensuring only authorized personnel can access necessary data. Remote or external (VPN) access to company data or the network is strictly blocked, except for top-level managers with pre-authorized manager keys.

## C. Defendants' Misappropriation of the JWA NMP Trade Secrets

52.    Jaewon began to suspect that Defendants might have misappropriated Jaewon's confidential information regarding its NMP recycling technology and

procedural know-how when Enchem America secured a major contract worth $6.5million per year with SK On's U.S. subsidiary, SK Battery America, only a few years after Defendants launched NMP recovery business and even before its first NMP recovery plant in Commerce, Georgia was completed. Later, the findings that at least six former Jaewon employees had moved to Enchem Korea and the market intelligence about the sudden improvement in Enchem America's recovered NMP product quality enhanced Jaewon's suspicion.

## (1) Enchem America's Initial Entry into the R-NMP Market Failed to Achieve Mass Production That Satisfied Its Customer Requirements

53. Starting in or about 2019, Enchem Korea initiated its entry into the NMP recovery business by signing an agreement with Duksan Co., Ltd. ("Duksan"), a South Korean engineering firm that specializes in the design and construction of distillation towers, to receive NMP distillation equipment for installation at its Hungary factory.

54. Duksan's plant engineering division primarily supplies waste recycling and refining facility technology. However, Duksan's recycling technology is focused on general industrial use (i.e., general chemical distillation), not secondary battery-grade purposes, which require significantly higher purity and yield levels. On information and belief, Duksan does not have the technology level required to purify secondary battery-grade NMP.

55.    Duskan's refining facility only guarantees a purity level of 99.85% with a yield of over 90%. In the early days of EV battery manufacturing, secondary battery manufacturers required only a minimum of 99% purity in R-NMP. However, today they expect much higher purity and yield levels in recovered NMP, because higher purity and yield guarantee better conductive quality, increased safety characteristics of EV batteries, and most importantly, lower operating costs in the manufacture of EV batteries. Based on its industry knowledge and R&D experience, JWA estimates that improving the R-NMP purity level from 99.85% to JWA's 99.9%+ purity level within a few years is a nearly impossible feat without precedent in the NMP industry, unless the competitor had ready access to already-proven technologies. In addition, achieving a yield of just 90% likely cannot sustain an economically viable R-NMP business, as EV battery manufacturers also require much higher yield levels to reduce their stringent manufacturing costs. In other words, with Duskan's base equipment and its capabilities alone, a new entrant like Enchem America cannot meet EV battery manufacturers' demands in an economically viable manner.

56.    In September 2019, Enchem Korea also established Enchem America in Commerce, Georgia, to formally launch its first R-NMP business in the United States. In August 2020, Enchem Korea and Duksan signed NMP Recovery Package supply contracts to install waste NMP refining facilities, including distillation towers,

at Enchem America's factory in Commerce, Georgia. The construction of Enchem's first U.S. R-NMP plant was completed in or about 2022.

57.    In 2021, Enchem America participated in the bidding for recovering NMP for SK Battery America (SK On's U.S. EV battery manufacturing entity) and secured its first U.S. R-NMP supply contract, despite having had no prior history of refining waste NMP for *any* U.S. customer.  Enchem's IR document in 2021 also stated that Enchem America was expected to mass-produce recovered NMP for supply to its key U.S. customers, such as LG Energy Solution and SK On, from the first half of 2022.[4]

58.    To compete with Enchem America, JWA also submitted its bid proposal to SK Battery America, in which JWA guaranteed a purity level in excess of 99.9% and a yield level in excess of 95%, but JWA's proposal was not selected by SK Battery America. On information and belief, JWA believes that Enchem America had submitted a bid in which it guaranteed similar purity and yield levels as JWA's at a lower price, as these purity and yield levels were consistent with what SK On and its affiliates had requested in its prior contracts with Jaewon.

59.    Shortly after winning its first R-NMP business in the United States, however, Enchem America was unable to mass produce recovered NMP in sufficient quantities and with specification requirements to meet its customer demands.

---

[4] https://dart.fss.or.kr/dsaf001/main.do?rcpNo=20211021000109.

60. In August 2021, SK On, acting on behalf of SK Battery America, requested Jaewon's European subsidiary to divert R-NMP volumes that had originally been destined for SK On's European manufacturing plant to Enchem America. Upon the request of SK On, Jaewon's facility in Hungary urgently shipped a total of four containers of R-NMP to Enchem America in Commerce, Georgia (the first shipment on September 21, 2021 and the second shipment on September 27, 2021) to help Enchem America fulfill its contractual obligations to SK Battery America.

61. From a confidential industry informant, JWA has also subsequently learned that during its initial years of U.S. operations, Enchem America had failed to achieve a yield level above 80% ― likely operating at a significant loss just to establish a "beachhead" in the new market. Based on its industry and manufacturing knowledge, JWA estimates that at a yield level below 80%, the economics of R-NMP business currently dictate that Enchem America likely had to purchase *new* organic NMP (rather than producing R-NMP) at a much higher price in the open market and combine it with its R-NMP volume *just* to fulfill its supply volume requirements for SK Battery America. Moreover, combining new NMP with its R-NMP (which already suffered from low purity levels, below \$99.8%) would also likely have allowed Enchem America to meet stringent minimum purity requirements that its initial R-NMP batches from the Commerce plant could not achieve.

62.     The initial manufacturing failures in 2021 by Enchem America to produce R-MNP that meets its *one and only* U.S. customer's stringent yield and purity specifications for R-NMP have created enormous pressure on Enchem America to improve its NMP purification metrics as quickly as possible. Not doing so would likely have resulted in losing its *one and only* U.S. customer and exiting the rapidly growing U.S. R-NMP market *altogether*. On information and belief, JWA believes that this immense pressure has prompted Defendants to orchestrate and coordinate multi-pronged strategies to illegally obtain and misappropriate the JWA NMP Trade Secrets as quickly as possible.

63.     Jaewon also confirmed that Enchem America had acquired Jaewon's confidential R-NMP compositions and specifications that it had earlier provided to its customers to further facilitate Enchem America's efforts to achieve the required R-NMP specifications for its U.S. customers. Jaewon has learned from a confidential industry informant that Defendants somehow acquired Jaewon's detailed R-NMP compositions and specifications sheets that Jaewon had provided to its customers. The specification and composition sheets contained detailed information about the compositions (including impurities targeted) of Jaewon's recovered NMP as well as the process of purifying and managing the product. Soon after JWA learned of this information, Enchem America was able to obtain approval from SK Battery America to become its long-term supplier of R-NMP.

**(2)** **In Effort to Overcome Its Technical Deficiencies, Defendants Began to Aggressively Poach Jaewon's Employees**

64.     On information and belief, Enchem Korea directed the hiring of at least six Jaewon employees because they had access to and/or intimate knowledge of the JWA NMP Trade Secrets, including but not limited to the type and methodology of impurities to be distilled and the operational procedures of the distillation facility and equipment for mass production of recovered NMP.

65.     On information and belief, Enchem was not able to mass-produce recovered NMP to meet the purity and yield levels required by secondary battery manufacturers until the end of 2023, placing it under enormous pressure to keep its customers. However, starting in late 2023, Enchem demonstrated significant improvement in both the purity and yield levels of its recovered NMP products. This improvement precisely coincided with the hiring of at least six (6) former Jaewon employees and reports from at least three of Jaewon's third-party engineering firms that Enchem Korea had reached out in an effort to elicit confidential engineering information regarding Jaewon's R-NMP facilities. In 2023 alone, Enchem Korea hired at least two former Jaewon employees and contacted at least one vendor to obtain Jaewon's distillation tower design specifications.

66.     Enchem Korea's practices of hiring former Jaewon employees and contacting Jaewon's vendors show a clear pattern of Defendants' attempt to develop and improve their NMP recovery process by obtaining the JWA NMP Trade Secrets.

Enchem Korea first hired an experienced researcher who had knowledge in identifying impurities in waste NMP and developing distillation methodologies tailored to specific impurities. After realizing that Enchem America's existing facility and equipment could not run the identified distillation process, Enchem Korea reached out Jaewon's employees and vendors who had experience and knowledge in designing and modifying NMP recovery equipment, including NMP distillation towers. Finally, Enchem Korea hired Jaewon's technical experts and distillation tower operators whose skills are critical for transitioning NMP recovery technology from a laboratory setting to mass-production.

67. Specifically, Former Employee A who had worked as a research engineer for Jaewon's chemical R&D team, joined Enchem Korea in 2022 around the time when Enchem America's Georgia plant was constructed. With a master's degree in organic chemistry, Former Employee A has rich knowledge of chemical reactions and production processes. At Jaewon's R&D team, Former Employee A was not only deeply involved in research activities of identifying impurities and designing methods to remove them from waste NMP, but he also had full access to all production process data, including Daily Operations Reports and NMP Refining Lab Reports. Jaewon believes that Defendants were able to understand which impurities should be removed through which methods to achieve a purity level of

over 99.9% by having Former Employee A join Enchem Korea. Former Employee A is believed to remain at Enchem Korea as of this complaint filing.

68.    On information and belief, Defendants failed to translate Jaewon's NMP purification technology into mass production of recovered NMP as Enchem America's existing distillation facility and equipment were not fit for Jaewon's process. Jaewon believes that the need to modify and improve Enchem America's facilities led to Enchem Korea's next move to poach Jaewon's plant engineering experts and vendors. Shortly after Former Employee A moved to Enchem Korea, another former employee, B, who had worked as a construction project manager at Jaewon, joined Enchem Korea. Former Employee B is believed to have a good level of knowledge in designing and modifying NMP recovery equipment, including NMP distillation towers, which Defendants needed to obtain to run Jaewon's NMP recovery technology at their Georgia plant.

69.    Enchem Korea's move to hire Jaewon's equipment engineer coincided with Enchem Korea's reaching out to Jaewon's engineering vendors. In May 2023, one Enchem Korea's employee contacted one of Jaewon's EPC vendors that handled Jaewon's Hungary plant construction. The Enchem Korea employee specifically requested a quote for an NMP plant EPC "based on the data" and "previous experience with NMP" the EPC company had. Because Jaewon was the only

company that this EPC company handled an NMP plant project for, Jaewon believes that Enchem Korea was requesting Jaewon's facility specifications.

70. Defendants' attempt to obtain Jaewon's NMP technology did not stop there. Enchem Korea's next move targeted Jaewon's distillation tower operators and technical experts, as mass production of recovered NMP requires sophisticated operating procedures and management skills to instantly and properly address any variances in raw materials and processes.

71. In late 2023, Former Employee C who had been with Jaewon for almost three decades joined Enchem Korea. Former Employee C participated in every stage of Jaewon's NMP recovery technology development and has in-depth knowledge of Jaewon's proprietary technology from R&D efforts to distillation tower management and detailed operation procedures. Former Employee C spent extended time at Enchem America's Georgia plant after he joined Enchem Korea.

72. Starting as an equipment operator, Former Employee C took on increasing responsibility at Jaewon. When he left Jaewon, he was the chief technical officer for Jaewon's joint venture, responsible for managing the entire NMP recovery process. As a living history of Jaewon's NMP recovery technology development, Former Employee C does not need to refer to any of Jaewon's manuals or SOPs because every single operating system and condition, along with appropriate responses to variances, are already engraved in his memory.

73.    According to a confidential informant, Former Employee C later admitted that he achieved "significant improvement" in the purity and yield levels of recovered NMP production at Enchem America by utilizing his expertise in NMP recovery technologies gained by working at Jaewon. He stated that he left Enchem Korea at the end of 2024 because his opinions were not fully appreciated during the process of redesigning the process to further improve NMP yield at Enchem America's Georgia facility.

**(3) IT Activity Records and E-mails of Former Employees Indicate That They Have Accelerated Downloads and Transfers of Key JWA NMP Trade Secret Documents Prior to Departures to Their Devices**

74.    Several former employees who departed to Enchem Korea during the relevant years have either possessed key internal R&D and tower management documents revealing the JWA NMP Trade Secrets or shown indications that they have accelerated downloads and transfers of such information as they approached their departure from Jaewon.

75.    Former Employee C's IT activity records and e-mails reveal that he had accelerated the downloads of key JWA NMP Trade Secrets documents as he approached his departure date from the company.

76.    As of his departure date, he had downloaded or likely possessed on his personal devices critical JWA NMP Trade Secrets documents and materials, including the following:

- Standard Operating Procedures_S-NMP Purification and Ion-Exchange
- Standard Operating Procedures_NMP ISO Container Sampling
- Standard Operating Procedures_NMP ISO-Container Hose Connection and Disconnection
- Standard Operating Procedures_Secondary Battery Grade NMP (M) Manufacturing
- Standard Operating Procedures_Filter Cartridge Exchange
- Standard Operating Procedures_Filter Maintenance
- Standard Operating Procedures_NMP Purification and Canister Filling
- Standard Operating Procedures_Sampling
- S-NMP Data.xlsx
- Potential Issues of Facility/Production.xlsx
- D-1901 Log Sheet
- Investigation on Peaks for CSOT_C-NMP Purification.pptx
- OLED-NMP [Limits Sampling]
- Estimated Production Cost
- Summaries of GBL Impurities

77.     As the Chinese joint venture entity's access to Jaewon's central Document Management System is systemically blocked, employees can access Jaewon's confidential information only through email attachments. When either the email sender or receiver opens attached documents in an email, it leaves "file download" log records.

78.     Former Employee C's file download log records show that within a month before his departure from Jaewon, he downloaded dozens of Jaewon's NMP technology-related files attached to emails from or to him. Given that the majority of emails to which these downloaded files were attached were sent or received more than a year and a half ago from the date Former Employee C re-opened these emails, such downloading activities raise a convincing suspicion that he was intentionally collecting these documents.

79.     More specifically, Former Employee C had requested early advance of his severance payments on April 2, 2023, as he was in extreme financial difficulties with his salaries being foreclosed by banks due to overdue loans. His request was rejected by the company on April 3, 2023. A week later, from April 11 to April 18, Former Employee C downloaded a total of 20 attachments, all of which were directly related to Jaewon's core NMP technology from prior emails dated from 2021 to 2022. For example, eight SOPs on different aspects of the NMP purification process, which were attached to an email dated September 27, 2021, were downloaded on April 18, three days after Former Employee C informed Jaewon of his intent not to renew his employment contract with Jaewon.

80.     The Chinese joint venture entity lacked normal security protocols. On information and belief, Former Employee C specifically capitalized on these security gaps to download and transfer documents to his own personal devices – even though

such transfers would not have been possible at either JWA or Jaewon Industrial Co., Ltd.

**(4) Several Former Employees Who Departed to Enchem Korea Later Stated that They Deployed the JWA NMP Trade Secrets to Increase Yield and Purity Results at Enchem America**

81. Confidential Informant A served as a close mentor to Former Employee C. In late 2024, Confidential Informant had an opportunity to speak as well as exchange various messages with Former Employee C. In those communications, Former Employee C confided that his move to Enchem Korea was in part motivated by Jaewon's failure to secure his continuing employment in Korea. Moreover, he confided that during his tenure at Enchem America, he not only directly participated in designing and training the R-NMP staff at Enchem America, but was also able to significantly improve both yield and purity levels of its new U.S. NMP business using his vast experience and know-how from Jaewon. Subsequently, he further communicated his personal belief to Confidential Informant A that Korean companies "rather than competing against each other, should assist each other with respect to developing" the leading NMP purification technologies.

**(5) Defendants Aggressively Attempted to Obtain the JWA Trade Secrets through Jaewon's Engineering Vendors and Affiliates**

82. On information and belief, Enchem Korea has reached out at least three companies that have worked for Jaewon and requested information obtained through working with Jaewon or being provided by Jaewon.

83. Engineering Company A is a South Korean EPC company. It is engaged primarily in designing engineering specifications, procuring facility parts and equipment, and constructing distillation towers based on the tailored needs of its various industrial clients. Specifically, Engineering Company A served as the principal engineering firm for Jaewon for constructing its R-NMP facility in Hungary. In May 2023, Enchem Korea directed one of its employees to send a message to Engineering Company A's CEO, requesting EPC designs, specifications, and cost estimates for building a similar NMP facility in the United States based on the vendor's previous engineering "experience" with Jaewon.

84. Despite Jaewon's warning against Enchem Korea's attempts to acquire Jaewon's trade secrets, Enchem Korea continued to solicit Jaewon's other engineering vendors. A former Jaewon employee disclosed Jaewon's confidential information related to boilers used in NMP recovery to Engineering Company B. The former employee testified that he had received the specifications of the boilers pursuant to Former Employee C's request. On information and belief, Engineering Company B used the data to subsequently participate in Enchem America's bid for constructing its Georgia NMP plant. Jaewon believes that Enchem America likely had difficulties in achieving required purity due to lack of boiler heat and wanted to set up the same boiler system as Jaewon's.

85.    According to a confidential informant, Enchem Korea also reached out to an NMP manufacturing company with which Jaewon created a joint venture and requested the company to create a joint venture with Enchem Korea in Europe.

**(6) Jaewon Has Sent Unequivocal Warnings to Enchem Korea for Its Trade Secret Misappropriation Attempts**

86.    Jaewon has warned Enchem Korea multiple times since it first found out about Enchem Korea's unlawful poaching and soliciting Jaewon's people to obtain Jaewon's trade secrets. For example, on June 23, 2023, Jaewon sent a cease-and-desist letter to Enchem Korea after presenting allegations that Enchem Korea inappropriately tried to obtain and use Jaewon's trade secrets. Enchem Korea first denied Jaewon's trade secret misappropriation allegations in its response to Jaewon.

87.    However, when Jaewon reiterated its cease-and-desist request to Enchem Korea by enclosing the declaration of Director of Engineering Company A, stating Enchem Korea requested him plant design "based on his previous work" with another company (Jaewon), Enchem Korea expressed regret for any misunderstanding and promised not to contact Jaewon's people in relation to Jaewon's trade secrets.

88.    However, Enchem Korea's practices of hiring Jaewon's former employees have continued even after the promise until today.

**(7) Enchem America's Sudden Growth and Improvement in NMP Recovery Business Could Not Have Been Possible Without Direct Access to the JWA Trade Secrets and Other Confidential Business Information**

89.     Enchem America has made significant improvements in its recovered NMP product quality in just a few years since around 2022, which would have been extremely difficult without direct access to Jaewon's trade secrets.

90.     On information and belief, Enchem America had difficulties in producing high purity recovered NMP at the yield high enough to meet even limited orders until the end of 2021.

91.     However, Enchem America began to generate increasing revenues from its NMP recovery business in mid-2022, which coincides with Enchem Korea's poaching of Jaewon's employees. Enchem America posted revenues of $8 million and $13 million from its recovered NMP business in 2022 and 2023, respectively, although no revenue had been reported until 2021.

92.     Former Employee C admitted to Jaewon that (1) his move to Enchem Korea directly contributed to significantly higher purity and yield levels at Enchem America, and (2) his own belief that Korean NMP companies should assist (rather than compete against) each other to better the national technologies relating to NMP purification.

93.     JWA's key customers for its recovered NMP products have also stated that Enchem America has recently marketed to them significant improvements in

purity and yield in its NMP distillates, as well as almost identical specifications of its recovered NMP products with Jaewon's end product, indicating Defendants were able to identify specific impurities in NMP that largely match the specific impurities that only JWA was able to distill and purify in the industry so far.

94. Other experts have also commented about the rapid rise of Enchem America in the NMP purification business and that it is rare to see a new entrant like Enchem America that is able to establish its position in just a few years without significant R&D.

95. The JWA NMP Trade Secrets are not publicly known and one would not be able to reverse engineer the internal workings of the facility, the logic behind the process or other features that differentiate critical attributes of Jaewon's refined NMP products in the market.

96. The trade secrets misappropriated by Defendants would provide Enchem America with a significant head start in commercializing and mass production of Jaewon's NMP products and technology.

97. On information and belief, Defendants are using and/or directing the use of other Jaewon's trade secrets and other confidential business information unlawfully misappropriated from Jaewon to rapidly advance their mass production of NMP recycling technology.

98.     On information and belief, without having misappropriated Jaewon's trade secrets and other confidential business information, Defendants would not have been able to so rapidly progress in their development of NMP recycling technology.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS
## UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)

99.     Plaintiff repeats and realleges the allegations of each of the foregoing paragraphs as if fully set forth herein.

100.    JWA is the owner of JWA's proprietary NMP refining technology and information on the process conditions under which good products are produced, as those trade secrets are specifically described above. These confidential and proprietary trade secrets have independent economic value and provide JWA with a competitive advantage, and Jaewon has spent significant time and money developing such confidential information and trade secrets. These trade secrets and confidential information, as described above, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3) ("DTSA").

101.    The JWA NMP Trade Secrets are not generally known to the public or generally known in the industry, and their value is derived from the fact that they are kept secret.

102. Jaewon spent considerable time and resources developing, refining and/or compiling the JWA NMP Trade Secrets.

103. The JWA NMP Trade Secrets are critical components used in the distillation and purification of waste NMP into secondary battery-level NMP. The JWA NMP Trade Secrets are the result of years and millions of dollars of research and development work to optimize facility design and recycling specifications and techniques.

104. It is impossible for other companies without the original technology to independently achieve the technical level required to mass-produce recovered NMP with similar purity and yield as Jaewon, without access to Jaewon's proprietary technology and the JWA NMP Trade Secrets. Even if it were possible, it would take a competitor a considerable amount of time, effort, expense, and expertise to replicate the JWA NMP Trade Secrets.

105. On information and belief, since Defendants first entered into the NMP recovery business in or about 2019, Defendants have consistently and aggressively attempted to obtain and use the JWA NMP Trade Secrets, primarily by (1) raiding Jaewon's employees and encouraging and improperly obtaining the JWA NMP Trade Secrets from those former employees, (2) eliciting Jaewon's third-party business partners to share the JWA NMP Trade Secrets with Defendants, and (3) obtaining the JWA NMP Trade Secrets directly from Jaewon's customers.

106.    On information and belief, Defendants have directed the hiring of at least six (6) Jaewon employees who had access to and intimate knowledge of the JWA NMP Trade Secrets, including but not limited to the type and methodology of impurities to be distilled and the operational procedures of the distillation facility, the material suppliers and equipment for mass production of recovered NMP. On information and belief, Defendants have elicited Jaewon's vendors to share the JWA NMP Trade Secrets with Defendants.

107.    Defendants misappropriated the JWA Trade Secrets and confidential information to benefit themselves, and to allow Defendants to unfairly compete against and harm JWA by acquiring and using the JWA NMP Trade Secrets, including in this District.

108.    Defendants knew or had reason to know at the time they acquired, accessed, and used the JWA Trade Secret and confidential information that this information is confidential and was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use. Defendants further knew or had reason to know that this information was developed or acquired by JWA at great expense and effort. Defendants further knew or had reason to know that JWA maintains this information as confidential and this information is not generally available to the public or JWA's competitors such that having this information would provide significant benefit to an outside party.

109. At no time has JWA consented to Defendants' improper acquisition, disclosure, or use of JWA's trade secrets for any reason.

110. Thus, Defendants have engaged in the actual and threatened misappropriation of the JWA Trade Secrets in violation of the DTSA.

111. Defendants' actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

112. Defendants are retaining and using JWA's trade secret and confidential information to compete with and/or otherwise harm JWA. As alleged herein, Defendants committed acts in furtherance of their misappropriation in the United States and in this District, including misappropriation of trade secrets that they obtained and utilized in this District with knowledge and intent to harm JWA in this District.

113. Defendants' misappropriation has proximately caused damage to JWA, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities for which JWA is seeking damages.

114. Defendants have been unjustly enriched as a further proximate result of their misappropriation of JWA's trade secret and confidential information for which JWA is also seeking damages.

115. Defendants' actions in misappropriating JWA's trade secret and confidential information were willful, fraudulent, malicious, and were done with the

intent to injure and oppress JWA and improve their own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

116.  JWA is also entitled to injunctive relief to protect its confidential information and trade secrets by (1) enjoining Defendants from further possessing, using or disclosing JWA's trade secret and confidential information; (2) enjoining Defendants from altering or deleting JWA's trade secret and confidential information, or any related evidence; and (3) requiring Defendants to turn over any and all copies of JWA's trade secret and confidential information to JWA.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS UNDER THE GEORGIA TRADE SECRETS ACT (O.C.G.A. § 10-1-760 *et seq.*)

117.  Plaintiff repeats and realleges the allegations of each of the foregoing paragraphs as if fully set forth herein.

118.  JWA is the owner of JWA's proprietary NMP refining technology and information on the process conditions under which good products are produced, as those trade secrets are specifically described above. These confidential and proprietary trade secrets have independent economic value and provide JWA with a competitive advantage, and Jaewon has spent significant time and money developing such confidential information and trade secrets. These trade secrets and confidential

information, as described above, constitute "trade secrets" within the meaning of O.C.G.A. § 10-1-761(4) ("GTSA").

119. The JWA NMP Trade Secrets are not generally known to the public or generally known in the industry, and their value is derived from the fact that they are kept secret.

120. Jaewon spent considerable time and resources developing, refining and/or compiling the JWA NMP Trade Secrets.

121. The JWA NMP Trade Secrets are critical components used in the distillation and purification of waste NMP into secondary battery-level NMP. The JWA NMP Trade Secrets are the result of years and millions of dollars of research and development work to optimize facility design and recycling specifications and techniques.

122. It is impossible for other companies without the original technology to independently achieve the technical level required to mass-produce recovered NMP with similar purity and yield as Jaewon, without access to Jaewon's proprietary technology and the JWA NMP Trade Secrets. Even if it were possible, it would take a competitor a considerable amount of time, effort, expense, and expertise to replicate the JWA NMP Trade Secrets.

123. On information and belief, since Defendants first entered into the NMP recovery business in or about 2019, Defendants have consistently and aggressively

attempted to obtain and use the JWA NMP Trade Secrets, primarily by (1) raiding Jaewon's employees and encouraging and improperly obtaining the JWA NMP Trade Secrets from those former employees, (2) eliciting Jaewon's third-party business partners to share the JWA NMP Trade Secrets with Defendants, and (3) obtaining the JWA NMP Trade Secrets directly from Jaewon's customers.

124.   On information and belief, Defendants have directed the hiring of at least six (6) Jaewon employees who had access to and intimate knowledge of the JWA NMP Trade Secrets, including but not limited to the type and methodology of impurities to be distilled and the operational procedures of the distillation facility, the material suppliers and equipment for mass production of recovered NMP. On information and belief, Defendants have elicited Jaewon's vendors to share the JWA NMP Trade Secrets with Defendants.

125.   Defendants misappropriated JWA's trade secrets and confidential information to benefit themselves, and to allow Defendants to unfairly compete against and harm JWA by acquiring and using JWA's trade secrets, including in this District.

126.   Defendants knew or had reason to know at the time they acquired, accessed, and used JWA's trade secret and confidential information that this information is confidential and was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

Defendants further knew or had reason to know that this information was developed or acquired by JWA at great expense and effort. Defendants further knew or had reason to know that JWA maintains this information as confidential and this information is not generally available to the public or JWA's competitors such that having this information would provide significant benefit to an outside party.

127. At no time has JWA consented to Defendants' improper acquisition, disclosure, or use of JWA's trade secrets for any reason.

128. Thus, Defendants have engaged in the actual and threatened misappropriation of JWA's trade secrets in violation of the GTSA.

129. Defendants' actions, as set forth herein, constitute "misappropriation" within the meaning of O.C.G.A. § 10-1-761.

130. Defendants are retaining and using JWA's trade secret and confidential information to compete with and/or otherwise harm JWA. As alleged herein, Defendants committed acts in furtherance of their misappropriation in the United States and in this District, including misappropriation of trade secrets that they obtained and utilized in this District with knowledge and intent to harm JWA in this District.

131. Defendants' misappropriation has proximately caused damage to JWA, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities for which JWA is seeking damages.

132.   Defendants have been unjustly enriched as a further proximate result of their misappropriation of JWA's trade secret and confidential information for which JWA is also seeking damages.

133.   Defendants' actions in misappropriating JWA's trade secret and confidential information were willful, fraudulent, malicious, and were done with the intent to injure and oppress JWA and improve their own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to O.C.G.A. § 10-1-763 and attorneys' fees pursuant to O.C.G.A. § 10-1-764.

134.   JWA is also entitled to injunctive relief to protect its confidential information and trade secrets by (1) enjoining Defendants from further possessing, using or disclosing JWA's trade secret and confidential information; (2) enjoining Defendants from altering or deleting JWA's trade secret and confidential information, or any related evidence; and (3) requiring Defendants to turn over any and all copies of JWA's trade secret and confidential information to JWA pursuant to § O.C.G.A. 10-1-762.

## COUNT III – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS OR BUSINESS RELATIONS BY MISAPPROPRIATION

135.   Jaewon repeats and realleges the allegations of each of the foregoing paragraphs as if fully set forth herein.

136.   The JWA NMP Trade Secrets are not generally known to the public or generally known in the industry, and their value is derived from the fact that they are kept secret. Jaewon spent considerable time and resources developing, refining and/or compiling the JWA NMP Trade Secrets.

137.   The JWA NMP Trade Secrets are critical components used in the distillation and purification of waste NMP into secondary battery-level NMP. The JWA NMP Trade Secrets are the result of years and millions of dollars of research and development work to optimize facility design and recycling specifications and techniques.

138.   On information and belief, Defendants have consistently and aggressively attempted to obtain and use the JWA NMP Trade Secrets, primarily by (1) raiding Jaewon's employees and encouraging and improperly obtaining the JWA NMP Trade Secrets from those former employees, (2) eliciting Jaewon's third-party business partners to share the JWA NMP Trade Secrets with Defendants, and (3) obtaining the JWA NMP Trade Secrets directly from Jaewon's customers.

139.   On information and belief, Defendants have directed the hiring of at least six (6) Jaewon employees who had access to and intimate knowledge of the JWA NMP Trade Secrets, thereby inducing the former employees to breach the Non-Disclosure Agreement and Non-Competition Agreement with Jaewon. Defendants hired Jaewon former employees with the knowledge of the existence of contractual

relations between the former employees and Jaewon and with the malice intention to injure JWA by taking advantage of competition from utilizing the JWA NMP Trade Secrets and other confidential information.

140.   On information and belief, Defendants have elicited Plaintiff's vendors to share the JWA NMP Trade Secrets with Defendants, thereby inducing the vendors to breach the Non-Disclosure Agreement with Jaewon. Defendants approached Jaewon's engineering vendors with the knowledge of the existence of contractual relations between them and Jaewon and with the malice intention to injure JWA by taking advantage of competition from utilizing the JWA NMP Trade Secrets and other confidential information.

141.   Defendants misappropriated JWA's trade secrets and confidential information obtained through breaches of the contractual obligations by Jaewon's former employees and engineering vendors to benefit themselves, and to allow Defendants to unfairly compete against and harm JWA by acquiring and using JWA's trade secrets, including in this District.

142.   Defendants' tortious conduct proximately caused damage to the Plaintiff by causing JWA's clients and customers or prospective clients and customers to discontinue their relationships or discussions for further business relationships with JWA.

143. Defendants knew or had reason to know at the time they acquired, accessed, and used JWA's trade secret and confidential information from JWA's former employees and engineering vendors that this information is confidential and they are under contractual obligations not to disclose this information to the public or JWA's competitors.

144. At no time has JWA consented to Defendants' improper acquisition, disclosure, or use of JWA's trade secrets for any reason.

145. At no time either Enchem Korea or Enchem America had a legitimate interest in either the contract or a party to the contract, making both Defendants a stranger to the contract.

146. As alleged herein, Defendants have committed wrongful conduct of inducing a breach of contractual obligations without privilege with malice, and with the intent to injure JWA. Defendants' tortious conduct proximately caused damage to JWA. Therefore, Defendants' conduct constitutes tortious interference with a contractual or business relationship under Georgia law.

147. Defendants' tortious interference has proximately caused damage to JWA, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities for which JWA is seeking damages.

148. Defendants have been unjustly enriched as a further proximate result of their tortious interference for which JWA is also seeking damages.

## COUNT IV – UNJUST ENRICHMENT

149.   Jaewon repeats and realleges the allegations of each of the foregoing paragraphs as if fully set forth herein.

150.   On information and belief, Defendants have unjustly retained, used, exploited, and/or otherwise benefitted from JWA's confidential information.

151.   JWA's confidential information unjustly retained, used, and/or exploited, on information and belief, by Defendants have unjustly conferred a valuable benefit on Defendants to the detriment of JWA.

152.   Retaining, using, exploiting, and/or otherwise benefitting from JWA's confidential information by Defendants would violate the fundamental principles of justice, equity, and good conscience.

153.   As a direct and proximate result of Defendants' willful, improper, and unlawful taking of an undue advantage through misappropriation of JWA's confidential information, JWA has suffered and will continue to suffer damages in an amount to be proven at trial, while Defendants have been unjustly enriched. JWA seeks damages including the actual loss caused by the misappropriation and any unjust enrichment resulting from Defendants' misappropriation to the extent any of the information misappropriated is not a trade secret under the GTSA.

154.   Because Defendants acted with malice, JWA is entitled to recover exemplary damages from Defendants.

## COUNT V – UNFAIR COMPETITION BY MISAPPROPRIATION

155.   Jaewon repeats and realleges the allegations of each of the foregoing paragraphs as if fully set forth herein.

156.   Defendants' wrongful conduct constitutes an unlawful act that interfered with JWA's ability to conduct its business.

157.   Defendants' conduct is independently tortious, illegal, unfair, and contrary to accepted business ethics.

158.   Specifically, Defendants misappropriated and used, in competition with JWA, JWA's confidential information, which was created by JWA through its expenditure of labor, skill, and money.

159.   As a direct and proximate result of Defendants' willful, improper, and unlawful misappropriation of JWA's confidential and proprietary information as well as Defendants' targeted efforts to induce Jaewon's employees to violate their employment covenants and join Defendants to the direct competitive detriment of JWA, JWA has suffered and will continue to suffer damages in an amount to be proven at trial, while Defendants have been unjustly enriched. JWA seeks damages including the actual loss caused by the misappropriation and any unjust enrichment resulting from Defendants' misappropriation to the extent any of the information misappropriated is not a trade secret under the GTSA.

160.   Because Defendants acted with malice, JWA is entitled to recover exemplary damages from Defendants.

## COUNT VI – CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS

161.   Jaewon repeats and realleges the allegations of each of the foregoing paragraphs as if fully set forth herein.

162.   Defendant Enchem Korea and Defendant Enchem America agreed and conspired to misappropriate JWA's trade secrets and confidential information to benefit themselves, and to allow Defendants to unfairly compete against and harm JWA by acquiring and using JWA's trade secrets, including in this District. Specifically, Enchem Korea has consistently and aggressively conspired and worked in concert with Enchem America to obtain the JWA NMP Trade Secrets, primarily by (1) raiding Jaewon's employees and encouraging them improperly to transfer the JWA NMP Trade Secrets to employees at Enchem America, (2) eliciting Jaewon's third-party engineering partners to share the JWA NMP Trade Secrets with Defendants, and (3) obtaining the JWA NMP Trade Secrets directly from Jaewon's customers in Korea with the intent to use the JWA NMP Trade Secrets to benefit Enchem America in this District.

163.   Defendants' concerted actions have proximately caused damage to JWA, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities for which JWA is seeking damages.

164. Defendants have been unjustly enriched as a further proximate result of their conspiracy to misappropriate JWA's trade secrets and confidential information for which JWA is also seeking damages.

165. Defendants' wrongful conduct constitutes an unlawful act that interfered with JWA's ability to conduct its business.

166. Defendants' concerted conduct is independently tortious, illegal, unfair, and contrary to accepted business ethics.

167. Specifically, Defendants conspired to misappropriate and used, in competition with JWA, JWA's confidential information, which was created by JWA through its expenditure of labor, skill, and money.

168. As a direct and proximate result of Defendants' willful, improper, and unlawful misappropriation of JWA's confidential and proprietary information as well as Defendants' targeted efforts to induce Jaewon's employees to violate their employment covenants and join Defendants to the direct competitive detriment of JWA, JWA has suffered and will continue to suffer damages in an amount to be proven at trial, while Defendants have been unjustly enriched. JWA seeks damages including the actual loss caused by the misappropriation and any unjust enrichment resulting from Defendants' misappropriation to the extent any of the information misappropriated is not a trade secret under the GTSA.

169. Because Defendants acted with malice, JWA is entitled to recover exemplary damages from Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A) That the Court enter judgment on all counts in favor of JWA;

B) That the Court adjudge that the JWA NMP Trade Secrets are valid and enforceable;

C) That the Court enter a worldwide permanent injunction enjoining Defendants from using, accessing, disclosing, or distributing any Jaewon's confidential or proprietary information and/or trade secrets, including but not limited to the JWA NMP Trade Secrets;

D) That the Court enter a permanent injunction against Defendants requiring them to return all documents, files, programs, data, metadata, and other information of any kind constituting or containing Jaewon's trade secret and/or confidential or proprietary information, preserved, without alteration, deletion, or spoliation, together with any and all copies of any of the foregoing in any medium or format including but not limited to their personal computers, drop box accounts, and the like;

E) That JWA be awarded damages in an amount to be determined at trial, plus pre- and post-judgment interest, costs, expenses, and

disbursements;

F) That JWA be awarded exemplary damages of twice the amount awarded as general damages for the first and second causes of action for misappropriation of trade secrets, under 18 U.S.C. § 1836(b)(3)(C) and O.C.G.A. § 10-1-763;

G) That JWA be awarded its reasonable attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D) and O.C.G.A. §10-1-764 and an award of Jaewon's reasonable attorney's fees and costs; and

H) For such other and further relief as this Court deems just and proper.

## JURY DEMAND

170. Plaintiff hereby requests a trial by jury on all matters so triable.

Dated: October 24, 2025   Respectfully submitted,

*/s/ Lucas A. Westby*
Lucas A. Westby
Georgia Bar No. 594008
lucas.westby@nelsonmullins.com
Annefloor de Groot
Georgia Bar No. 933355
Annefloor.degroot@nelsonmullins.com
NELSON MULLINS RILEY &
SCARBOROUGH LLP
201 17th Street NW, Suite 1700
Atlanta, Georgia 30363
Telephone: (404) 322-6000
Facsimile: (404) 322-1600

Andrew J. Lee (*pro hac vice* application forthcoming)
D.C. Bar No. 477781
andrew.lee@nelsonmullins.com
NELSON MULLINS RILEY &
SCARBOROUGH LLP
101 Constitution Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 689-2833

*Attorneys for Plaintiff*

## LR 5.1(B) CERTIFICATE OF COMPLIANCE

The undersigned certifies, pursuant to Local Rules 5.1(B) and 7.1(D), that the foregoing has been prepared in size 14 Times New Roman.

*/s/ Lucas A. Westby*
Lucas A. Westby

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing has been filed on October 24, 2025, using the Court's CM/ECF system, which will send notice of electronic filing to all parties registered with the system.

/s/ Lucas A. Westby
Lucas A. Westby